IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASSEMBLY TECHNOLOGY INC. | : | CIVIL ACTION |
| | : | NO. 09-00798 |
| v. | : | |
| | : | |
| SAMSUNG TECHWIN CO., LTD. | : | |

O'NEILL, J.                                                    FEBRUARY 23, 2010

MEMORANDUM

Assembly Technology Inc. ("ATI") alleges that Samsung Techwin Co. tortiously interfered with ATI's contract with a group of third party consultants. On November 16, 2009, I dismissed ATI's amended complaint and granted leave to amend. On December 4, 2009, ATI filed a second amended complaint. Presently before me is Samsung's motion to dismiss the second amended complaint, ATI's response and Samsung's reply. I heard oral argument on February 1, 2010. For the following reasons I will grant Samsung's motion to dismiss.

BACKGROUND

Samsung manufactures and sells high-speed chip mounting machinery. ATI developed and operated software used by Samsung in the manufacturing process and provides consulting services in connection therewith. Moe Tehrani, ATI's president, was employed by Samsung for a period of five years. In 1999, he was encouraged by Samsung to start his own company. As an incentive, Samsung promised to award Tehrani all of its United States-based research and development projects related to semiconductor equipment. As a condition to receiving the exclusive rights to this work, ATI would be prohibited from working for any other company. Shortly thereafter Tehrani founded ATI.

In 2002, ATI contracted with Roy Lee Epp and Advanced Micro Concept (collectively,

"consultants") to provide consulting services to ATI. The contracts memorializing the agreement were drafted by Samsung and signed by the consultants and ATI. The consultants continued their business relationship with ATI through January 2, 2007. At all times relevant hereto, the consultants were at-will employees of ATI.[1]

For the first six years of the relationship between ATI and Samsung, Samsung funded ATI's annual budget. Beginning in 2005, however, the two parties entered into a series of annual agreements that detailed the financial arrangement for the upcoming year. Each agreement set forth the research and development projects to be handled by ATI and fixed ATI's costs, expenses and salaries for the year. Those agreements also fixed the salaries to be paid to the consultants. In 2006, the parties memorialized their agreement in two contracts. The agreement commenced on January 2, 2006 and was to expire fourteen months later. Samsung paid ATI the full amount due–$578,360–for work performed under that contract.

In late 2006, the parties began discussing the 2007 version of the contract. As part of those discussions, Samsung suggested that ATI reduce its project budget by 60%, inclusive of salaries. In December 2006, apparently before the parties could come to an agreement regarding the 2007 version of the ATI-Samsung contract, Samsung advised ATI that the consultants intended to resign from ATI. On January 2, 2007, the consultants formally notified ATI of their resignation. Samsung received a copy of the consultants' resignation letter.

Negotiation of the ATI-Samsung agreement proceeded through the "winter of 2006/2007." However, in "late winter/early spring of 2007," ATI learned that Samsung would not renew the ATI-Samsung agreement. Instead, Samsung hired the consultants to perform the

---

[1]     ATI conceded this fact at oral argument.

work that theretofore had been performed by ATI.

STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Typically, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," though plaintiff's obligation to state the grounds of entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." Id., citations omitted. The complaint must state "'enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." Wilkerson v. New Media Tech. Charter School Inc., 522 F.3d 315, 321 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556). The Court of Appeals has recently made clear that after Ashcroft v. Iqbal, --- U.S. ---, 129 S. Ct. 1937, 1955, 173 L. Ed. 2d 868 (2009), "conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' Iqbal, 129 S. Ct. at 1949. To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). The Court of Appeals also set forth a two part-analysis for reviewing motions to dismiss in civil actions in light of Twombly and Iqbal: "First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may

3

disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" Id. at *5 (quoting Iqbal, 129 S. Ct. at 1950). The Court of Appeal explained, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." Id., citing Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.'" Iqbal, 129 S. Ct. at 1949.

## DISCUSSION

I.     Legal Standard

       A.     Absence of Privilege or Justification

In order to state a claim for tortious interference with a business relationship, the plaintiff must allege:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

CGB Occupational Therapy, Inc. v. RHA Health Services Inc., 357 F.3d 375, 384 (3d Cir. 2004) (citing Crivelli v. General Motors Corp., 215 F.3d 386, 394 (3d Cir. 2000) and Pawlowski v. Smorto, 588 A.2d 36, 39-40 (Pa. Super. Ct. 1991)).

Disposition of the present motion turns on whether ATI has adequately pled the absence of privilege or justification on the part of the defendant. Samsung argues that the business

competitor's privilege applies here. The business competitor's privilege is a qualified privilege

for a business to interfere with a competitor's business relationships. See, e.g., Phillips v. Selig,

959 A.2d 420, 431 (Pa. Super. Ct. 2008) (applying the business competitor's privilege). The

contours of the privilege are set forth in Section 768 of Restatement (Second) of Torts which

provides:

> (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>> (a) the relation concerns a matter involved in the competition between the actor and the other and
>> (b) the actor does not employ wrongful means and
>> (c) his action does not create or continue an unlawful restraint of trade and
>> (d) his purpose is at least in part to advance his interest in competing with the other.
> (2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

Accumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 215 (3d Cir. 2009) (citing

Gilbert v. Otterson, 550 A.2d 550, 554 (Pa. Super. Ct. 1988)) ("Pennsylvania has adopted section

768 of the Restatement (Second) of Torts, which recognizes that competitors, in certain

circumstances, are privileged in the course of competition to interfere with others' prospective

contractual relationships.").

The Court of Appeals has recently emphasized the importance of this privilege:

> [t]he law necessarily recognizes this privilege because if more than one party seeks to sell similar products to prospective purchasers, both necessarily are interfering with the other's attempt to do the same thing. Moreover, even if an entity has an existing contractual relationship with another entity, a stranger to the relationship must be

privileged to seek to replace one of the entities lest competition be stifled.

_Acumed LLC v. Advanced Surgical Servs., Inc._, 561 F.3d 199, 215 (3d Cir. 2009). The Court of Appeals for the Seventh Circuit put it rather more dramatically:

> [t]here is in general nothing wrong with one sports agent trying to take a client from another if this can be done without precipitating a breach of contract. That is the process known as competition, which though painful, fierce, frequently ruthless, sometimes Darwinian in its pitilessness, is the cornerstone of our highly successful economic system. Competition is not a tort.

_Speakers of Sport, Inc. v. ProServ, Inc._, 178 F.3d 862, 865 (7th Cir. 1999) (citations omitted) (discussing alleged intentional interference by one sports agent with the business relationship of another sports agent).

In response to defendant's motion to dismiss the first amended complaint, plaintiff argued that the parties were not competitors. I disagreed, finding that they were competing for the services of the consultants. In a footnote to its present brief, plaintiff acknowledges that ruling without conceding that it was correct and proceeds accordingly. At oral argument, however, both parties referred to a line of Pennsylvania cases beginning with _Adler, Barish, Daniels, Levin and Creskoff v. Epstein_, 393 A.2d 1175 (Pa. 1978), that, per plaintiff's interpretation, indicate that Pennsylvania courts will apply section 767–not section 768–to claims of tortious interference with an at-will employment contract. _See, e.g., Franklin Music Co. v. American Broadcasting Cos., Inc._, 616 F.2d 528, 543-44 (3d Cir. 1979); _SI Handling Sys. v. Heisley_, 658 F. Supp. 362, 374 n.12 (E.D. Pa. 1986). Section 767 defines improper conduct and applies to tortious interference claims where the business competitor's privilege is not implicated. _See Crivelli v. Gen. Motors Corp._, 215 F.3d 386, 394-96 (3d Cir. 2000) (applying section 767 to a tortious

interference claim that did not implicate the business competitor's privilege).  Although plaintiff

did not direct my attention to this line of cases in its briefs and did not pursue the issue at oral

argument, I think it important to discuss my decision to apply section 768.

     1.    Two Approaches to Claims of Tortious Interference with the Employment
          Agreement of an At-Will Employee

Pennsylvania case law takes two approaches to cases involving claims of tortious

interference with the employment agreement of an at-will employee.  Where such tortious

interference occurred at the hands of a business competitor, the courts will, unsurprisingly, apply

the business competitors' privilege set forth in section 768.  See, e.g., CGB Occupational

Therapy, Inc., 357 F.3d at 388.  Where, on the other hand, the allegedly interfering acts are done

by a former employee who later becomes a business competitor, the courts do not apply the

business competitor's privilege.  Instead, they apply section 767 of the Restatement.  See, e.g.,

Adler Barish, 393 A.2d 1183-84.

     a.    Cases Applying Section 767

Review of the case law confirms this conclusion.  In Adler Barish, the Pennsylvania

Supreme Court considered tortious interference claims in the context of a rather unusual factual

scenario.  There, the defendants had been associates with the law firm of Adler Barish for slightly

more than one year.  See Adler Barish, 393 A.2d at 1177.  They were at-will employees.  While

still employed by the firm, the defendants began to discuss forming their own firm.  They

retained counsel to advise them with regard to their venture, they signed a lease and they

obtained a line of credit.  As collateral for their credit line, they provided a list of open cases on

which they had worked while associated with Adler Barish.  None of those cases, however,

actually belonged to the defendants.  Therefore, before terminating their employment with Adler Barish, the defendants made a concerted effort to convince those clients to transfer their cases to the defendants' new law firm.  The defendants called the clients they had targeted and often visited them in person.  Each communication informed the clients that the defendants were starting their own firm by which the client could choose to be represented.  In addition, the defendants sent the clients form letters that could be used to discharge Adler Barish and name the defendants as new counsel.  These attempts to procure business continued until Adler Barish filed its complaint which alleged, among other claims, one count of tortious interference with existing contractual relations.

Specifically, Adler Barish alleged that the defendants tortiously interfered with its contractual relationships with its clients.  The question presented for the Court's review was whether the defendants' conduct was improper under the rubric set forth in sections 766 and 767. Id. at 1183.  In essence, the court found that the defendants' conduct was improper because there was "nothing in the rules of the game which society has adopted [that] sanctions [the defendants'] conduct."  Id. at 1184.  Notably, the court did not apply the business competitor's privilege; indeed, it never even mentioned section 768.[2]

Just over a year later, the Court of Appeals, in Franklin Music Co., interpreted Adler

---

[2]     The court did use the term "privilege" in its discussion, but that reference is a merely a remnant of the First Restatement's definition of tortious interference.  The First Restatement provided: "[o]ne who without a privilege to do so, induces or otherwise purposely causes a third person not to [perform a contract] . . . is liable to the other for the harm caused thereby."  Restatement of Torts § 766 (1939).  The Second Restatement, in recognition of the fact that "this branch of tort law has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege," replaced the privilege inquiry with a case by case analysis of whether the interference was "improper."  See Restatement (Second) of Torts § 767, cmt. b.

<u>Barish</u> to mean that "when the [tortious] interference involves the activity of a present or former employee the general standards of section 767 rather than those of section 768 apply, even though the employee is a potential or actual competitor." <u>Franklin Music Co.</u>, 616 F.2d at 544. In <u>Franklin Music Co.</u>, the plaintiff operated a chain of retail music stores. Albert S. Franklin, the president of Franklin Music Company ("FMC"), owned fifteen percent of the company. The remaining eighty-five percent was owned by Edward Rosen, the chairman of the company. In 1973, the defendant, American Broadcasting Company ("ABC"), decided to enter the retail music market. It approached Franklin while he was still employed by FMC to discuss the possibility that he would either sell FMC to ABC or accept employment with ABC. In the course of these discussions, ABC's agents visited FMC stores and were shown information that FMC alleged to be confidential. Rosen was not aware of these negotiations until Franklin informed him that he would be resigning to accept employment with ABC. Thereafter, Franklin approached various "key employees" of FMC and induced them to join ABC.

FMC sued ABC and Franklin, alleging that they had unlawfully interfered with the contractual relationship between FMC and its employees. The Court of Appeals held that <u>Adler Barish</u> precluded Franklin's invocation of the business competitor's privilege. <u>See id.</u> The notable similarity between <u>Adler Barish</u> and <u>Franklin Music Co.</u> is that the plaintiff in both cases sued its former employee or employees for interfering with its present contracts. The application of section 767 instead of section 768 was in both cases predicated on the unique nature of the employee-turned-competitor.

        b.        Case Applying Section 768

On the other hand, in deciding that the business competitor's privilege applied in this

case, I relied on CGB, which analyzed claims of tortious interference under section 768. See

CGB Occupational Therapy, 357 F.3d at 379. CGB was a provider of rehabilitation therapy

services. It contracted with nursing homes and assisted living facilities to provide such services

and, once under contract, provided each facility with trained therapists. The defendant, RHA,

owned two nursing home facilities which were managed by co-defendant Sunrise Management.

CGB and RHA entered into an agreement whereby CGB would provide therapy services to

RHA's nursing homes. The contract included an "anti-raiding clause" which provided that if

CGB were ever terminated RHA would not seek to employ directly CGB's at-will therapists for a

period of twelve months. More than three years later, Sunrise sent a letter informing CGB that

its services would be terminated in ninety days. The next day, Sunrise hired another company,

Symphony Health Services, to replace CGB. An agent of Sunrise, Marjorie Tomes, then

approached several CGB therapists and mentioned that there was a possibility that they could be

employed with Symphony. Several therapists accepted Tomes's offer and signed contracts with

Symphony. This action was, in CGB's view, tortious interference with CGB's employment

contracts with its at-will therapists. The Court of Appeals addressed the question of "whether

intermeddling by a third party (Sunrise) in the relationship between an employer and its at-will

employees is an actionable tort." Id. at 388. It applied section 768 and held "[t]hus, with respect

to Sunrise's interference with CGB's at-will therapists, the issue is not whether Sunrise's actions

were outside the scope of its authority as RHA/Pennsylvania's agent, but rather whether its

actions were wrongful." Id.

   c.  Conclusion - Section 768 Applies in the Present Case

  Review of these cases reveals a critical distinction between those applying section 767

and those applying section 768. Section 767 applies to allegations of tortious interference by a former employee-turned-competitor, while section 768 applies to allegations of tortious interference by a competitor who had never been employed by the plaintiff. For example, both the Adler Barish and Franklin Music Courts applied section 767 where the plaintiff brought a tortious interference claim against its former employee. See Franklin Music, 616 F.2d at 542 (pursuing tortious interference claim against, inter alia, former president of Franklin Music); Adler Barish, 393 A.2d at 429 (pursuing tortious interference claim against lawyers formerly associated with the firm).[3] On the other hand, the CGB Court applied section 768 where the business competitor was not a former employee. CGB Occupational Therapy, 357 F.3d at 388.

In the present case, Samsung is not a former employee of ATI. Therefore, CGB is factually similar and that Court's analysis controls here. I will accordingly adhere to my original ruling that the parties are business competitors and section 768 applies.

---

[3]    In Franklin Music, the plaintiff also brought claims against ABC, its competitor in the retail music field. Although somewhat unclear from the Court of Appeals's opinion, the district court appears to have applied section 768 to those claims. Franklin Music, 616 F.2d at 544. The Court of Appeals affirmed that decision, noting "Pennsylvania would hold that [conduct attributable to the defendants] is evidence of an improper motive under sections 767(b) and 767(c) and evidence of the resort to wrongful means under section 768(1)(b) of the Restatement (Second) of Torts." This conclusion is supported by a related discussion of section 768 by the Court wherein it acknowledged:

> the trial court started with the generally recognized rule that an employer is not free to restrict the post employment activities of his at-will employees, or to prevent them, while employed, from looking for other employment. As a necessary corollary of that principle, other employers are free to compete with the first employer for the services of at-will employees. The Restatement formulations in both versions of section 768 recognize that corollary.

Franklin Music, 616 F.2d at 544-45. So the Franklin Music Court, like the Adler Barish Court, applied section 767 to those claims of tortious interference against Franklin, its former employee. However, the Court applied section 768 to claims of tortious interference against ABC.

11

2. How Plaintiff Can Satisfy its Burden to Plead Absence of Privilege

At this stage, the only way in which ATI can plead absence of privilege or justification on the part of Samsung is to allege that Samsung's conduct violates one of the standards set forth in sections 768(1)(a) - (d).[4] ATI asserts that it has borne its burden. Specifically, ATI argues that it has adequately pled that Samsung used wrongful means in interfering with ATI's relationship with the consultants which, pursuant to section 768(1)(b), prevents Samsung from invoking the privilege. See Restatement (Second) of Torts § 768(1)(b); Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 531 (3d Cir. 1998) (discussing section 768(1)(b)). I must determine, then, whether the actions alleged in plaintiff's second amended complaint constitute wrongful means or whether, instead, defendant's actions merely exemplify the type of "painful, fierce [and] frequently ruthless" competition expected in our free-market system. Speakers of Sport, Inc., 178 F.3d at 865.

B. Definition of Wrongful Means

The parties disagree as to the definition of wrongful means. As a federal court exercising diversity jurisdiction, I must apply the substantive law as propounded by the Pennsylvania Supreme Court. See Travelers Indem. Co. of Illinois v. DiBartolo, 131 F.3d 343, 348 (3d Cir.

---

[4] Ordinarily, there are three ways to plead absence of privilege or justification. In addition to the way noted in the text, a plaintiff can allege that the defendant was not a business competitor. In light of my ruling supra that the parties are business competitors, this method is unavailable in this case. Second, a plaintiff can allege that the contract at issue was not terminable at will and therefore section 768(2) prohibits application of the privilege. ATI admitted at oral argument that the contract at issue was terminable at will. Thus, this method is unavailable as well.

I also note that the parties' briefs address only whether ATI has adequately pled "wrongful means." There is no mention of the other ways in which ATI might show that the competitors privilege is inapplicable. ATI's failure to raise any other argument as to why the competitor's privilege should not apply constitutes a waiver of those other grounds.

1997).  That Court has not, however, expressly defined wrongful means.  See Nat'l Data Payment Sys., Inc. v. Meridian Bank, 212 F.3d 849, 857 (3d Cir. 2000) (". . . the Pennsylvania Supreme Court has not yet supplied a definition of wrongful means . . ."); accord Acumed LLC, 561 F.3d at 215 ("Moreover, we noted in [Nat'l Data Payment Sys., Inc.] that even though the Pennsylvania courts have not interpreted the "wrongful means" element of section 768 . . ."). Therefore, I must predict how the Pennsylvania Supreme Court would resolve the issue. Travelers Indem. Co., 131 F.3d at 348.

    1.   Authority Supporting Samsung's Definition of Wrongful Means

   Samsung argues that wrongful means is limited to physical violence, fraud, civil suits, criminal prosecutions and independently actionable conduct.  Def's Br. at 9.  In support of its assertion it cites the commentary to section 768 which provides that "predatory means . . . , physical violence, fraud, civil suits and criminal prosecutions are all wrongful in the situation covered by this [s]ection."  § 768, cmt. e.  Additionally, it notes that the Court of Appeals has held wrongful means to include "conduct that [is] actionable on a basis independent of the interference claim," Acumed, 561 F.3d at 215 (citing Brokerage Concepts, 140 F.3d at 531; DP-Tek, Inc. v. AT&T Global Info. Solutions Co., 100 F.3d 828, 833-35 (10th Cir. 1996)), and has predicted that the Pennsylvania Supreme Court would adopt this definition.  Acumed, 561 F.3d at 215-16 (citing Nat'l Data Payment Sys., Inc., 212 F.3d at 858; CGB Occupational Therapy, Inc., 357 F.3d at 389).  The Court has further noted that in order to satisfy the "independently actionable" definition of wrongful means, the conduct need not necessarily be actionable by the plaintiff as long as it is actionable by some party.  CGB Occupational Therapy, Inc., 357 F.3d at 389 ("Conduct that is independently actionable by anyone is sufficiently "wrongful" to satisfy the

requirements of the tort of interference.").  No Pennsylvania court has yet disagreed with these

predictions.  See Cornerstone Sys., Inc. v. Knichel Logistics, L.P., No. 2:03cv584, 2006 WL

2471531, at *11 (W.D. Pa. Aug. 24, 2006), rev'd on other grounds, 255 Fed. Appx. 660 (3d Cir.

2007).

Samsung also notes that the Restatement's commentary expressly excludes "persuasion

[and the exertion of] limited economic pressure" from the category of wrongful means.  § 768,

cmt e.  Later, the same commentary provides:

> [t]he competitor is therefore free, for his own competitive advantage,
> to obtain the future benefits for himself by causing the termination.
> Thus he may offer better contract terms, as by offering an employee
> of the plaintiff more money to work for him or by offering a seller
> higher prices for goods, and he may make use of persuasion or other
> suitable means, all without liability.

Id. at cmt. i.

### 2.    Authority Supporting ATI's Definition of Wrongful Means

ATI acknowledges that there is some precedent in Pennsylvania supporting Samsung's

definition of wrongful conduct, but cites case law from a variety of jurisdictions in support of its

argument that I should apply a somewhat broader definition.  It suggests that the Pennsylvania

courts would define wrongful conduct to include unethical conduct, sharp dealing, overreaching

and unfair competition.

ATI relies primarily on two cases in support of its broader definition.[5]  First, in Diamond

---

[5]    ATI also includes two string cites of cases, mostly from other jurisdictions, that
purport to apply a broader standard.  ATI has not included any substantive discussion of such
cases.  I have reviewed each of the cited cases and find that none requires lengthy discussion.
Only two actually discuss Pennsylvania law.  The first is Adler Barish, which is discussed at
length supra and irrelevant to the question of what constitutes wrongful conduct; the second is
SmithKline Beecham Corp. v. Apotex Corp., 383 F. Supp. 2d 686, 704 (E.D. Pa. 2004), which
held that bringing a "sham lawsuit" is "wrongful and independently actionable."  See SmithKline

Triumph Auto Glass, Inc. v. Safelite Glass Corp., 441 F. Supp. 2d 695, 715-16 (M.D. Pa. 2006),

the court allowed the plaintiff's claim for tortious interference with a business relationship to

proceed where the plaintiff, a glass repair company, alleged that the defendant, a competing glass

company, serviced the plaintiff's customers without the consent of either the plaintiff or the

customers.  Specifically, on numerous occasions, a customer scheduled an appointment with the

plaintiff to have a vehicle window replaced.  Several hours before the appointment was to occur,

however, the defendant's technician arrived and replaced the window without authorization.  Id.

Such conduct is clearly independently actionable.[6]  Diamond Triumph, therefore, cannot support

ATI's assertion that the Pennsylvania courts would adopt a broader definition of wrongful means.

ATI also relies on Ken-Pin, Inc. v. Vantage Bowling Corp., No. 02-C-7791, 2004 WL

783092, at *8 (N.D. Ill. Jan. 20, 2004).  There, the plaintiff, a company that markets, sells,

installs and services bowling equipment, bought the exclusive rights to market, install and

---

Beecham Corp., 383 F. Supp. 2d at 704.  Neither supports ATI's position.  I note that most of the remainder of the cases cited by ATI do not actually apply definitions that are substantively broader than that proposed by Samsung.

     [6]     Having only the District Court's opinion before me, it is impossible to find precisely what cause of action could have been pursued in Diamond Triumph.  At minimum, however, the defendant could potentially have been liable for fraud, see B.O. v. C.O., 590 A.2d 313, 315 (1991) (requiring "(1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as the proximate result."), trespass to chattels, see Pestco v. Associated Prods. Inc., 880 A.2d 700 (Pa. Super. Ct.) ("A trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel; or (b) using or intermeddling with chattel in the possession of another."), or conversion, see Stevenson v. Economy Bank of Ambridge, 197 A.2d 721, 726 (Pa. 1964) ("a conversion is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification").  The important conclusion, however, is not precisely what cause of action would have accrued under the circumstances of Diamond Triumph, but that some cause of action clearly could have been alleged.

service an automatic bowling scoring system manufactured by Computer Score. The hardware for the automatic scoring system was manufactured in Australia and then shipped at considerable cost to the United States. To avoid this cost, the plaintiff contracted with the defendant to assemble the scoring systems in the United States. The plaintiff then hired Art and Craig Lackenbach to install the scoring systems that were manufactured by the defendant. The Lackenbach's employment contract contained non-compete covenants prohibiting them from engaging in certain commercial activities in the bowling industry for two years. After working for the plaintiff for a little over two years, the Lackenbach's resigned and went to work for Vantage. The plaintiff alleged that Vantage tortiously interfered with its contracts with both Computer Score and the Lackenbachs. In denying Vantage's motion to dismiss, the court acknowledged the allegations that "the Vantage [d]efendants deceptively encouraged Ken-Pin to introduce Vantage to Computer Score . . . while hiding from Ken-Pin that their intention was not to enhance Ken-Pin's enjoyment of its right to distribute Scoring Systems, but to abrogate that right altogether." Id. at *8. I find that Ken-Pin does not support ATI's assertion for the same reason Diamond Triumph does not–because the allegations relied upon by the Court in that case constitute actionable misrepresentations or fraud.[7]

---

[7]     The discussion in footnote 6 supra applies with full force to my discussion of why Ken-Pin is distinguishable from the present case. I also note that the Ken-Pin Court pointed out that "Ken-Pin also describes the Vantage Defendants' actions as "wrongful" in its complaint," and held that such allegation was sufficient to raise a question of fact as to whether the conduct was indeed wrongful. Ken-Pin, Inc., 2004 WL 783092, at *8. Since Ken-Pin, the United States Supreme Court has heightened the pleading standard under Rule 8 substantially. See Twombly, 550 U.S. at 555. After Twombly, I am not bound to accept legal conclusions couched as factual assertions. See id. Therefore, even if it was sufficient before Twombly merely to characterize the defendant's actions as wrongful, such is clearly insufficient presently.

3. Wrongful Means Does not Include Conduct that Is not Independently Actionable

I find that the Court of Appeals has accurately predicted that the Pennsylvania Supreme Court would define wrongful means as predatory means, physical violence, fraud, civil suits, criminal prosecutions and other independently actionable conduct. This standard strikes an appropriate balance between encouraging healthy economic competition while prohibiting conduct that ultimately interferes with the operation of the free market. Unlike ATI's proposed definition which prohibits, among other things, "sharp dealing" and "overreaching," Samsung's definition of wrongful conduct provides an objectively discernable standard by which business competitors can assess their conduct. Courts have often favored such clear standards, see, e.g., Bowsher v. Merck & Co., Inc., 460 U.S. 824, 841 n.18 (1983) ("Bright line rules upon which the parties' expectations may be firmly established are preferable to the protracted litigation that [a less objective approach] would engender"); In re Zoller, 792 A.2d 34, 39 n.4 (Pa. Ct. Jud. Disc. 2001) (". . . in determining what are the reasonable expectations of the public . . . an objective standard is certainly preferable and, we believe, demanded."), and the rationale of those courts applies with equal force to this matter.

II. Application

A. ATI's Allegations

With these standards in mind, I turn to the allegations contained in plaintiff's second amended complaint.[8] Such allegations are largely contained in thirty-five paragraphs entitled

---

[8] As referenced in footnote 8 supra, I note at the outset that plaintiff's allegation that "[d]efendant's conduct was improper, deceptive and without privilege or justification" is insufficient, without more, to satisfy plaintiff's burden to plead absence of privilege. Twombly "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

"Defendant's Wrongful Conduct."  In its brief in opposition to the motion to dismiss, plaintiff has condensed those thirty five paragraphs into two theories of wrongful means.  First, that "[d]efendant improperly interfered with the restrictive covenents and duty of good faith in the [c]onsulting [a]greements by inducing the ATI Consultants to use their knowledge relating to services/products developed at ATI in violation of the covenants therein."  Pl.'s Br. at 6 (citing Second Am. Compl. ¶ 69).  Second, that "[d]efendant's conduct was wrongful given the special relationship between [d]efendant and ATI, through which [d]efendant had access to ATI's secrets, ideas, strategies, or products, in large part because [d]efendant dictated the terms of [] ATI's business module, contracts, and virtually all aspects of ATI's existence."  Id. (citing Second Am. Compl. ¶¶ 68-69).

At oral argument, plaintiff helpfully clarified its argument.  In essence, ATI argues that due to the unique relationship between Samsung and ATI, Samsung had inside information as to what ATI was able to pay its consultants.  It then wrongfully took advantage of that information by offering to pay the consultants more money.  In its brief, ATI analogizes Samsung's conduct to insider trading.  Pl.'s Br. at 1.  The only remaining question is whether such conduct is sufficiently wrongful to bar Samsung's invocation of the business competitor's privilege.

B.       Independently Actionable Conduct

Accepting plaintiff's allegations as true, I find that Samsung's actions in this case did not rise to the level of wrongful means.  Both parties agree that the conduct does not rise to the level of "predatory means, physical violence, fraud, civil suits or criminal prosecutions."  ATI, however, urges me to find that Samsung's alleged conduct constitutes independently actionable

_____

of action will not do."  Twombly, 550 U.S. at 555.

conduct.  Namely, that Samsung "induc[ed] and conspir[ed] with the ATI Consultants to breach

the covenants in the [ATI-Consultants] contract, and to breach their duty of good faith."  Pl.'s Br.

at 10.  Later, ATI vaguely argues that the consultants breached their fiduciary duty to ATI.  <u>See</u>

<u>id.</u>

Breach of contract is clearly independently actionable conduct.  However, I find the

allegations in the second amended complaint to be insufficient to plead breach of contract.

Paragraph 27 contains the allegedly breached provisions:

> 5. **Convenants of the Consultant**
>
> 5.1    During the term of this Agreement, the Consultant shall work exclusively
> for the tasks described in article 2.  And serve in good faith for ATI, and
> shall not cooperate with any third party in [sic] USA in connection with
> the work services unless the Consultant obtains the prior written consent
> of ATI.
>
> 5.2    The Consultant agrees that all confidential and proprietary information,
> including without limitation, technical information, programming technics,
> trade secrets, information relating to Products, customer lists, financial
> information and other information relating to the business or operation of
> ATI which the Consultant acquires by virtue of his consulting with ATI
> during the term of this Agreement shall be kept and treated as confidential
> during and for a period of two (2) years after the termination of this
> Agreement.
>
> 5.3    Any inventions or developments made by the Consultant with respect to
> technical consulting in connection with the work services shall be owned
> by ATI including all proprietary rights therein.

At oral argument, ATI conceded that it does not allege that Samsung committed trade secret

violations or disclosed confidential information.  Thus, if a breach of contract occurred in this

case, it must have been with respect to section 5.1.  In Pennsylvania, a breach of contract claim

contains three elements: (1) the existence of a contract, including its essential terms; (2) a breach

of a duty imposed by the contract; and (3) resultant damages. See Omicrom Sys., Inc. v. Weiner, 860 A.2d 554, 564 (Pa. Super. Ct. 2004). The first and third elements have been sufficiently alleged. However, the second amended complaint does not sufficiently allege breach. ATI alleges only that Samsung and the consultants had discussions about having the consultants work directly for Samsung. See Second Am. Compl. ¶¶ 54-56. It is well settled that at will employees are not prohibited from seeking other work opportunities, see United Aircraft Corp. v. Boreen, 413 F.2d 694, 700 (3d Cir. 1969), and employers are not prohibited from offering employment to another's at will employees. See Albee Homes, Inc. v. Caddie Homes, Inc., 207 A.2d 768, 771 (Pa. 1965). Accordingly, the consultants did not breach the ATI-Consultants contract or the duties of good faith contained therein merely by discussing with Samsung the possibility of future employment. Having failed to allege a breach of those provisions, ATI's allegations that Samsung "induced and conspired with [the consultants]" to commit the breaches must also fail.

Likewise, ATI has failed to allege that the consultants breached their fiduciary duty to ATI. A breach of fiduciary duty claim contains three elements: "(1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of [the] plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit . . . was a real factor in bringing about plaintiff's injuries." See McDermott v. Party City Corp., 11 F. Supp. 2d 612, 626 n.18 (E.D. Pa. 1998). Assuming that the second and third elements have been adequately pled, ATI's complaint does not include sufficient allegations that the consultants failed to act in good faith. As discussed supra, ATI alleges only that the consultants discussed with Samsung the possibility that they would accept employment with Samsung. See Second Am. Compl. ¶¶ 54-56. As a matter

of law, such actions do not amount to breach of fiduciary duty.  See United Aircraft Corp., 413

F.2d at 700.

Finally, I find that ATI's allegations of wrongful means as set forth at oral argument are

likewise deficient.  To the extent that it argues that Samsung induced the consultants to terminate

their contract by offering them more money, that result was anticipated and expressly sanctioned

by the drafters of the Restatement:

> As for the future hopes [an employer] has no legal right but only an
> expectancy; and when the contract is terminated by the choice of the
> third person there is no breach of it. The competitor is therefore free,
> for his own competitive advantage, to obtain the future benefits for
> himself by causing the termination. Thus he may offer better contract
> terms, as by offering an employee of the plaintiff more money to
> work for him or by offering a seller higher prices for goods, and he
> may make use of persuasion or other suitable means, all without
> liability.

Restatement (Second) of Torts § 768, cmt. i.  The fact that Samsung had information about ATI's

budgetary constraints does not change this analysis.  There is no allegation that such information

was wrongfully obtained by Samsung.  Indeed, by all accounts, Samsung and ATI shared

financial information freely.[9]  If ATI had wanted to avoid the possibility that Samsung would

seek to hire the consultants directly, it could have included a non-compete clause in the ATI-

Consultants contract or it could have limited the quantity and quality of the financial information

it shared with Samsung.  As Samsung points out, either option would have been expensive.

Having chosen not to spend the resources, however, ATI cannot now gain such protection under

---

[9]     Certainly, to the extent that ATI argues that knowledge of the consultants'
salaries, and the subsequent use thereof, could constitute wrongful means, I must disagree.
Information regarding the salaries of the consultants was available to whomever the consultants
chose to provide it.

the guise of a tortious interference claim.

CONCLUSION

ATI has once again failed to allege sufficiently that Samsung's interference with the ATI-Consultants contract was not privileged. Specifically, the Second Amended Complaint contains no allegations of wrongful conduct on the part of Samsung. Accordingly, I will grant Samsung's motion and dismiss ATI's Second Amended Complaint.[10]

An appropriate Order follows.

---

[10] Because this case will be dismissed, I have no need to consider Samsung's alternative argument that this case should be referred to arbitration.